OPINION. *Page 2 
{¶ 1} Defendant-appellant Amberley Village appeals a decision of the trial court granting the request of plaintiff-appellee the Ridge Club and plaintiff Hal Homes for a declaratory judgment. That decision was based upon competent, credible evidence and we affirm.
 The Grass is No Longer Greener {¶ 2} Amberley Village was incorporated in 1940. At that time, a golf course was already in operation in the location that would become the home of the Crest Hills Country Club. In 1966, the property was classified as "Park" property under the Amberley Village zoning code. This "P" classification limited the use of the property to golf courses, parks (including picnic facilities), and public playgrounds (not otherwise attached to schools). The only two properties that were given this designation were the Crest Hills property and French Park — a public park owned by the city of Cincinnati.
 {¶ 3} The country club began losing money in the early 1990s. The members considered several options and eventually decided to unite with another club — the Losantiville Country Club — in 2002. The combined entity became the Ridge Club.
 {¶ 4} After the merger, however, the Ridge Club continued to lose money and members. The members decided that one of the properties had to be sold, and they chose the Crest Hills location. The Ridge Club received bids in a closed auction, with the best bid coming from Hal Homes. Hal Homes wanted to use the property for residential development, but was prevented from doing so because of the property's "P" zoning classification. Hal Homes sought to have that zoning changed, but was unsuccessful.
 The Declaratory-Judgment Action {¶ 5} The Ridge Club filed a declaratory-judgment action seeking a declaration that keeping the property zoned as a park violated its rights to due process and that the *Page 3 
zoning so destroyed the market value of the property that it constituted a taking. The Ridge Club also sought injunctive relief and damages. Hal Homes was later added as a party. Just before trial, the parties agreed that only the due-process issue would be tried to the bench. The remaining determinations regarding injunctive relief and damages were deferred.
 {¶ 6} The trial lasted eleven days — often into the evening — and saw the admission of hundreds of exhibits. The transcript of the trial consists of 2,500 pages. Additionally, the parties submitted post-trial briefs and proposed findings of fact and conclusions of law. The record indicates that the trial court thoroughly reviewed the entire trial transcript, the written arguments, and every single exhibit. Having done so, and having listened to the oral argument of the parties, the trial court determined that application of the "P" classification to the property was arbitrary and unreasonable, having no substantial relation to the health, safety, and welfare of Amberley Village. The trial court also concluded that the "P" classification denied "the economically viable or reasonable use of the subject property." Finally, the trial court found that the residential use proposed by the Ridge Club, with bumper zones of green space in the property's borders, was consistent with the character of the neighborhood and the purpose of the zoning code.
 The Standard of Review — Manifest Weight {¶ 7} In a single assignment of error, Amberley Village now asserts that the decision below was incorrect. However, the first disagreement between the parties in this case is over the standard of review on appeal. Amberley Village asserts that our review is de novo because the question of the constitutionality of an ordinance is a question of law. It also argues for de novo review because the trial court made no factual findings. The Ridge Club argues that this court must determine whether the trial court's decision is against the manifest weight of the evidence. The Ridge Club is correct. *Page 4 
 {¶ 8} When considering the constitutionality of a zoning ordinance as applied to a particular piece of property, the Ohio Supreme Court has held that "judgments supported by competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. If the evidence is susceptible to more than one interpretation, we must give it the interpretation consistent with the trial court's judgment."[1] In this process, every reasonable presumption must be made in favor of the judgment.[2]
 {¶ 9} We reject the argument that the absence of findings of fact in the trial court's decision is the legal equivalent of the trial court having made none. As the Ridge Club points out, "[f]ar from a stipulated record, the trial court heard a total of 12 witnesses over 11 days of testimony, and was presented with numerous exhibits." In reaching its decision, the trial court clearly made determinations as to the credibility of witnesses — accepting some testimony and rejecting other testimony that contradicted it. It found some exhibits more helpful than others. We will not re-examine the entire corpus of proof and thereby substitute our judgment for that of the trial court.
 The Constitutionality of Zoning Ordinances {¶ 10} Absent any other evidence, we begin with the presumption that a zoning ordinance is constitutional.[3] To prevail at trial, the Ridge Club had to show that the ordinance at issue was unconstitutional "beyond fair debate."[4] This standard is similar to the "beyond a reasonable doubt" standard used in the context of a criminal trial.[5]
Importantly, however, the "beyond fair debate" standard is not defeated simply because *Page 5 
one side can find an expert to disagree with an expert from the other side. "A mere difference of opinion is not sufficient to make the issue of validity of a zoning ordinance fairly debatable because it is relatively easy for a property owner and a municipality to obtain the services of expert witnesses who will have differing opinions as to the validity of a zoning ordinance."[6]
 {¶ 11} When a trial court addresses a constitutional challenge to a zoning ordinance, the court considers whether the zoning classification is arbitrary and unreasonable, having no substantial relationship to the health, safety, and welfare of the municipality.[7] Alternatively, a zoning ordinance is unconstitutional when it "denies the economically viable use of the land without substantially advancing a legitimate government interest."[8] In this case, the trial court decided that both prongs of this disjunctive test invalidated the "P" classification. We consider each in turn.
 Denial of the Economically Viable or Reasonably Practical Use of the Property {¶ 12} In its decision, the trial court concluded that the "P" classification denied "the economically viable or reasonably practical use of the subject property[.]" This conclusion was supported by competent, credible evidence.
 {¶ 13} Ordinarily, a zoning ordinance is proper so long as the owner is not deprived of the reasonable use of his property.[9] In that sense, Amberley Village correctly argues that a landowner does not have the right to have his land zoned for its most advantageous economic use.[10] The central inquiry is whether the regulation *Page 6 
denies an owner all economically viable use of his land.[11] If the regulation restricts the use of the land so as to "render it valueless, the permitted uses are not economically feasible, or the regulation permits only uses which are highly improbable or practically impossible under the circumstances,"[12] the regulation is unconstitutional.
 {¶ 14} On appeal, Amberley Village argues that the trial court ignored the undisputed facts that the Ridge Club "could use the Property as its home if it wanted to" and that it "received substantial offers to purchase the property that were not contingent upon rezoning." A review of the record reveals that neither contention was undisputed at trial.
 {¶ 15} Amberley Village contended below that the Ridge Club could have continued to use the subject property as its club home. But the expert who testified on behalf of the village disagreed. He testified that "[i]n my opinion, after looking at the demographics, the amount of golfers, and the drive time and the local competition, I do not feel that Crest Hills was feasible for a private club because of all the private clubs noted and how close the private clubs are to Crest Hills."
 {¶ 16} In related testimony, that expert did express an opinion that the property could be used as a public golf course. However, the expert witness who testified on behalf of the Ridge Club raised significant questions regarding the accuracy of the assumptions used in reaching such a conclusion. He testified that the figures used were overly optimistic and simply unattainable. It was within the sound discretion of the trial court to rely on the Ridge Club's expert testimony.
 {¶ 17} There was also a significant difference of opinion on whether the Ridge Club had received any legitimate offers to purchase the property that would have allowed it to operate with a conforming use. Amberley Village cited evidence that a number of *Page 7 
individuals would have purchased the property for use as a golf course. On the other hand, the Ridge Club presented evidence that none of these offers was bona fide.
 {¶ 18} The first individual, Craig Fanning, offered to operate the property as a golf course. However, Fanning did not wish to actually purchase the property or to pay the taxes, debt service, rent, insurance, maintenance, and other expenses related to the property itself. Under these circumstances, the trial court was entitled to conclude that his was not a bona fide offer.
 {¶ 19} Amberley Village also asserted that To Life, LLC, had offered to purchase the property and to use it as a golf course. However, the only direct evidence of this offer came from the president of the Ridge Club, who testified that To Life, LLC, was not interested in operating a golf course.
 {¶ 20} Amberley Village also presented the testimony of Jerry Carroll of Carroll Properties regarding negotiations to purchase the property. However, he also testified that he proposed to make a profit by adding upscale dining, a spa, and entertainment facilities that would not have been allowed under the current zoning. While Carroll testified that the Ridge Club had placed restrictions on the purchase that were onerous and an indication that it had no intention of selling, the Ridge Club presented evidence that his was not a serious offer. It was for the trial court to decide which version to believe.
 {¶ 21} Other similar evidence was presented by Amberley Village and was similarly rebutted by the Ridge Club. In each case, it was for the trial court to resolve the differences in the testimony.
 {¶ 22} A review of the testimony and exhibits reveals ample evidence to support the conclusion of the trial court that none of the allowed uses under the "P" classification was economically feasible for a private landowner. William King, a real-estate appraiser and golf-course consultant, testified that the property had no value on the market as a *Page 8 
golf course because a golf course would not succeed there. He did testify that the property had some value as a public park. However, there were only two entities that could have purchased it for such a use — Amberley Village and the Hamilton County Park District. Neither had shown an interest. While some of this testimony was disputed, it was enough to allow the trial court to conclude that the "P" classification allowed for no use of the privately owned property that was economically viable.
 {¶ 23} In sum, there was evidence presented that the allowed uses under the "P" classification were not reasonable or economically viable. The Ridge Club had the choice of either operating a golf course that would continue to lose money or opening a 120-acre playground or public park that would have done worse. These choices were simply unreasonable, and the trial court had ample evidence before it to reach that conclusion.
 Unreasonable and not Necessary to the Health, Safety, and Welfare of the Municipality {¶ 24} The trial court alternatively found that the "P" classification in this case was arbitrary and unreasonable, having no substantial relationship to the public health, safety, morals, or general welfare of Amberley Village. This conclusion was also supported by competent, credible evidence.
 {¶ 25} Amberley Village asserted that a number of governmental interests were advanced by enforcing the "P" classification: (1) the preservation of open space; (2) the maintenance of the property's "rural character and ambiance"; (3) the provision of recreational opportunities to village residents; (4) the reduction of demand on the village's resources; (5) the preservation of wildlife habitat; (6) the control of the village's population; and (6) the preservation of the village's orderly plan for development. Of these, Amberley Village claimed that the first two were the most important interests advanced by the "P" classification. *Page 9 
 {¶ 26} At trial, the Ridge Club presented expert testimony that, while such open space could be important, Amberley Village had more open space than it needed due to the size of the village and the existence of a public park owned by the city of Cincinnati. The expert further testified that, in all of his years of experience, he had never seen such a large parcel that was both privately owned and so strictly limited by zoning regulations to only open-space uses. He also testified that every other country club in Hamilton County was zoned to allow residential development. He added the following:
 {¶ 27} "If the area was zoned residentially and the golf course ceased to exist, then out of the classification of the zoning, the property owner would have proceeded with a subdivision plan, or a plan that would have a certain type of housing, depending on the zoning, to develop it according to the regs [sic] and as is consistent with the uses around it.
 {¶ 28} "But because it's only zoned for a park, and it's only limited to the uses that are permitted, and all the other uses are nonconforming uses, it's very, very restrictive. And this is why I said initially that I do not know or have I ever represented to a governmental entity to carry out the intent of securing a, and setting aside, land for open space by zoning it to such a restrictive classification."
 {¶ 29} While the "P" classification may advance legitimate state interests, it must do so in a reasonable manner. While an expert testifying for Amberley Village opined that the zoning classification was proper, the opinions he gave were based only on a consideration of the benefits that inured to Amberley Village. The Ohio Supreme Court has held that zoning regulations must balance the benefits to the public against the disadvantages to the private interests of the landowner.[13] *Page 10 
 {¶ 30} During a heated cross-examination, the expert testified that "you keep referring to `from the owner's perspective.' The zoning, the validity of the zoning is not dependent upon looking at the owner's versus community's perspective. The validity of the zoning, in my mind, is conceptually a very simple issue, does it advance a legitimate public interest, and is there an economic value in the property."
 {¶ 31} In light of this testimony, the trial court could have properly rejected the opinions offered by Amberley Village because they were formed without properly balancing the public and private interests. This balancing is what ensures that the classification is reasonable.
 {¶ 32} The problem with considering only the needs of Amberley Village is that a purely governmental use would always pass such a test, but would be wholly inappropriate when imposed on a private landowner. This issue was explored when the Amberley Village expert admitted that, from the "public interest perspective," the "P" classification would remain valid even if the only permitted use was as a public park. He also testified that use of the property as a police station or firehouse would have similarly served a legitimate public interest. While these uses do serve a public interest, it cannot be said that zoning private property for use as only a public park, a police station, or a firehouse is a reasonable restriction on land use.
 {¶ 33} And it was this problem that the trial court could not overcome. Announcing its decision from the bench, the trial court stated that "a municipality cannot impose on a private owner the duty of a public function, i.e., to create and maintain a park, or in this case a golf course, for the greater good of the community. * * * If Amberley Village wanted to use this private property for a park or a golf course of that type, it should have taken it by eminent domain and paid for it." *Page 11 
 {¶ 34} The court's decision is buttressed by a consideration of the economic impact of the "P" classification on the property. The fact that the "P" classification was not economically feasible for the property could have been viewed as strong evidence that the classification bore no substantial relationship to the rationale presented by the village.[14]
 {¶ 35} The Twelfth Appellate District addressed a similar situation and concluded that "[w]hile the economic feasibility analysis is directly related to the taking issue, * * * it is also related to the constitutionality of the zoning designation * * *."[15] Where zoning essentially permits only one kind of development, and such development is not economically feasible, there is strong evidence that the designation bears no substantial relationship to the purposes proffered by the government.[16]
 {¶ 36} In this case, there was testimony that the "P" classification was no longer economically feasible as applied to the Ridge Club's property. Such testimony further supported the trial court's conclusion that the classification was "arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."[17]
 {¶ 37} Thus, while each side presented evidence supporting its position, evaluating the evidence and assessing the credibility of the witnesses were primarily for the trier of fact. The trial court was free to reject the testimony that the permitted uses under the "P" classification were reasonable and substantially related to a legitimate governmental interest. *Page 12 
 The Approved Use {¶ 38} Having concluded that the "P" classification was unconstitutional as applied to this parcel, the trial court determined that the residential use specifically proposed by the Ridge Club was appropriate. This determination was justified to avoid leaving the property in an unzoned state.[18] Since Amberley Village has not argued that the trial court acted improperly in this respect, we will not disturb its determination.
 Conclusion {¶ 39} The trial court determined that the "P" classification was unconstitutional as applied to the property in this case for two distinct reasons. First, the court concluded that the imposition of the classification denied "the economically viable or reasonable use of the subject property." The court also concluded that the classification was arbitrary and unreasonable, having no substantial relation to the health, safety, and welfare of Amberley Village. Either conclusion was sufficient to invalidate the classification with respect to the Ridge Club's property, and both were supported by competent, credible evidence. We affirm the judgment of the trial court.
Judgment affirmed.
PAINTER, P.J., and WINKLER, J., concur.
RALPH WINKLER, retired, from the First Appellate District, sitting by assignment.
[1] Cent. Motors Corp. v. Pepper Pike, 73 Ohio St.3d 581, 584,1995-Ohio-289, 653 N.E.2d 639, citing C.E. Morris Co. v. Foley Constr.Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, and Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 461 N.E.2d 1273.
[2] Shemo v. Mayfield Heights, 88 Ohio St.3d 7, 10, 2000-Ohio-258,722 N.E.2d 1018.
[3] Cent. Motors, 73 Ohio St.3d at 583-584, 653 N.E.2d 639.
[4] Id. at 584.
[5] Id.
[6] Cent. Motors Corp. v. Pepper Pike (1979), 63 Ohio App.2d 34,409 N.E.2d 258, reversed on other grounds in Cent. Motors Corp. v. PepperPike, 73 Ohio St.3d 581, 1995-Ohio-289, 653 N.E.2d 639.
[7] Id.
[8] Id.
[9] Columbia Oldsmobile, Inc. v. Montgomery (1990), 56 Ohio St.3d 60,62-63, 564 N.E.2d 455, citing Valley Auto Lease of Chagrin Falls, Inc.v. Auburn Twp. Bd. of Zoning Appeals (1988), 38 Ohio St.3d 184,527 N.E. 2d 825, syllabus.
[10] See Smythe v. Butler Twp. (1993), 85 Ohio App.3d 616, 621,620 N.E.2d 901.
[11] See, e.g., Andrus v. Allard (1979), 444 U.S. 51, 66,100 S.Ct. 318 (denial of takings claim even though it was "undeniable that the regulations here prevent the most profitable use of [the] property").
[12] Valley Auto Lease, 38 Ohio St.3d at 187, 527 N.E.2d 825.
[13] Jaylin Investments, Inc. v. Moreland Hills, 107 Ohio St.3d 339,2006-Ohio-4, 839 N.E.2d 903, ¶ 14, citing C. Miller Chevrolet, Inc. v.Willoughby Hills (1974), 38 Ohio St.2d 298, 303, 313 N.E.2d 400.
[14] See Nectow v. Cambridge (1928), 277 U.S. 183, 187,48 S.Ct. 447.
[15] Clarke v. Warren Cty. Bd. of Commrs., 150 Ohio App.3d 14, 21,2002-Ohio-6006, 778 N.E.2d 111, citing Holiday Homes, Inc. v. Miami Twp.Bd. of Trustees (Oct. 19, 1996), 12th Dist. Nos. CA91-11-096 and CA91-11-097; Valley Auto Lease of Chagrin Falls, 38 Ohio St.3d at 527,527 N.E.2d 825.
[16] Id., citing Nectow, 277 U.S. at 187, 48 S.Ct. 447.
[17] Jaylin Investments, Inc., 107 Ohio St.3d at 342, 2006-Ohio-4,839 N.E.2d 903, quoting Goldberg Cos., Inc. v. Richmond Hts. CityCouncil, 81 Ohio St.3d 207, 210, 1998-Ohio-456, 690 N.E.2d 510, syllabus.
[18] See North Olmsted Land Holdings, Ltd. v. Planning Comm. of NorthOlmsted (Nov. 8, 2001), 8th Dist. No. 77584, citing Goldberg,88 Ohio St.3d at 212-213, 1998-Ohio-456, 690 N.E.2d 510, and Flair Corp. v.Brecksville (1976), 49 Ohio App.2d 77, 85, 359 N.E.2d 459. *Page 1